G. Mark Albright, Esq.,
Nevada Bar No. 1394
Albright, Stoddard, Warnick & Albright.
Quail Park I, Suite D-4
801 South Rancho Drive
Las Vegas, Nevada 89106
Tel: (702) 384-7111
Fax: (702) 384-0605
gma@albrightstoddard.com

David G. Eisenstein, Esq.
Law Office David Eisenstein
California Bar No. 224646
(*pro hac vice* pending
Will comply with LR 1A 11-2 within 10 days
Post Office Box 1202
Carlsbad, California 92018
Tel: (858) 345-6838
Fax: (858)345-6836
Eisenlegal@gmail.com
Attorneys for the Plaintiff NOLAND

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| JAMES D. NOLAND JR., a Nevada resident;<br>Plaintiff,<br><br>vs.<br><br>ORGANO GOLD INTERNATIONAL, INC., a Nevada corporation; ORGANO GOLD INTERNATIONAL INC., a Washington corporation; ORGANO GOLD ENTERPRISES, INC., a British Columbia, Canada corporation, HOLTON BUGGS JR. and JANE DOE BUGGS, Texas residents; BERNARDO CHUA, a British Columbia, Canada resident, SHANE MORAND, an Ontario, Canada resident; and JAMIE FOO, a British Columbia, Canada resident;<br><br>Defendants. | CASE NO.:<br><br>**PLAINTIFF NOLAND'S COMPLAINT:**<br><br>I.   Violations of RICO Statutes (Racketeer Influenced Corrupt Organizations Act);<br>II.  Conspiracy to commit violations of RICO Statutes;<br>III. Nevada RICO Violations;<br><br>(JURY DEMAND) |

**COMES NOW** Plaintiff JAMES D. NOLAND JR., a resident of Nevada, ("Plaintiff NOLAND") by and through his attorneys undersigned, and for his claims against Defendants ORGANO GOLD INTERNATIONAL, INC., *et. al*, ("Defendants") alleges as follows:

## SUBJECT MATTER JURISDICTION

1. This Court has federal question jurisdiction over the subject matter of this case under 28 U.S.C. § 1331; 18 U.S.C. § 1961 *et seq.* (outlawing Racketeer Influenced Corrupt Organizations ("RICO")); Federal Trade Commission Act § 5, 15 U.S.C. § 45(a)(1) (2012) (declaring unlawful unfair or deceptive trade practices).

2. This Court has subject matter jurisdiction over the state claims raised in this lawsuit by virtue of 28 U.S.C. § 1367(a).

3. The parties—namely Plaintiff NOLAND and Defendant enterprise Organo Gold Enterprises, Inc. *et al*, a British Columbia, Canada corporation ("OGEI Canada")—have ongoing litigation pending in British Columbia, Canada, in the Supreme Court (a trial court) of the Province of British Columbia, No. S106359, Vancouver Registry. This Court has subject matter jurisdiction over Plaintiff NOLAND's Complaint as both Plaintiff NOLAND's case and the Canada case arise from the same "case and controversy," 28 U.S.C. § 1367(a), and deal with the subject matter of Defendant entities' corrupt sales scheme. The claims in the Canada case differ only slightly, as Canada does not have anti-RICO laws or equivalent civil remedies.

4. Defendants have consistently conducted the overwhelming majority of their corrupt sales and business schemes in the United States. Defendants carried out a substantial portion of their United States business dealings through Defendant enterprise Organo Gold International, Inc., a Nevada corporation, which is based in Henderson, Nevada ("OGEI Nevada").

5. Plaintiff NOLAND is a resident of Henderson, Nevada and seeks remedies in this Court for injuries suffered by him as a result of the Defendants' corrupt practices in violation of United States RICO laws; therefore, only a federal district court can adjudicate Plaintiff NOLAND's claim. Plaintiff NOLAND also seeks remedies under the Nevada RICO statute by way of this Court's pendent jurisdiction.

## PERSONAL JURISDICTION AND VENUE

6. OGEI Nevada is a corporation incorporated and doing business at all times in the State of Nevada. All Defendant entities named in the caption of this Complaint have committed fraudulent, tortious, and, otherwise, unlawful acts amounting to racketeering; furthermore, Defendants have breached numerous contracts that were often made outside of Nevada, but that directly caused damage in Nevada and injured Plaintiff NOLAND.

7. Plaintiff NOLAND is a resident of Henderson, Nevada. Those acts by Defendants who reside or have been organized as entities outside of the State of Nevada give rise to the personal jurisdiction of this Court pursuant to Nevada's long arm statute, Nev. Rev. Stat. 14.065, and the Due Process Clause of the U.S. Constitution. Defendants have engaged in activities with substantial effects in Nevada. Therefore, venue in this District is appropriate, pursuant to 28 U.S.C. § 1391, because this District is the "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred;" therefore, this Court has personal jurisdiction over Defendants for all acts alleged throughout this Complaint.

## INTRODUCTION AND STATEMENT OF FACTS

8. Plaintiff NOLAND is a long-time business consultant for marketing companies and an expert in coaching and training sales representatives who serve as independent contractors of marketing companies. His coaching and training consists of advanced level learning, practicing and applying new skill sets as well as learning, practicing, and applying productive variations and enhancements on their existing skill sets, all of which expertise Plaintiff NOLAND has applied to his work with marketing companies for approximately twenty (20) years.

9. In or around April 2008, Plaintiff NOLAND, who was then a resident of Oklahoma, entered into a partnership with Defendants Bernard CHUA ("Defendant CHUA") and Shane MORAND ("Defendant MORAND") (collectively referred to as "the PARTNERS") to establish Defendant Organo Gold Enterprises, Inc. ("Defendant OGEI" or "OGEI") in British Columbia,

-3-

Canada as a marketing and sales company. Defendant OGEI's flagship product is a ganoderma-based coffee made from gourmet coffee beans ("the PRODUCT"), which was marketed to independent contractor distributors, who subsequently marketed and sold the PRODUCT to their friends, relatives, and acquaintances, and provided direct customer support. Thus, Defendant OGEI was organized as a marketing and sales organization by the PARTNERS advertised the PRODUCT and recruited distributors using social media, email, and other online advertising schemes, and then advised the distributors in selling to other potential customers.

10. While direct customer support is a key element of most traditional sales organizations, Defendant OGEI did not provide direct customer support. Instead, the PARTNERS formed itself as a sales channel known as *"network"* or *"multi-level marketing"* ("MLM"). Under the MLM model, if a new customer opts to become a distributor (sometimes termed "sales associate") for the network marketing company, then that new recruit is owed support and training responsibilities from the sales associate who "sponsored" (recruited) the new distributor.

11. At the inception of Defendant OGEI in 2008, the PARTNERS established an oral partnership agreement ("the AGREEMENT"), which has been confirmed by documentary and audio and video evidence. Which established the following terms:

    a. The name of Defendant OGEI,

    b. Defendant OGEI and its employees and distributors, including Defendants CHUA and MORAND and Plaintiff NOLAND, would all adhere to the highest standards of business integrity, meaning that all these parties would (1) not engage in any deceptive or misleading marketing practices, and (2) strictly comply with all local laws in the countries in which they carried on business, including consumer protection laws, competition laws, and other laws applicable to network marketing businesses;

-4-

c. Plaintiff NOLAND and Defendant MORAND would be responsible for the OGEI's "field operations: of their business, namely business sales, through the recruitment, training, management, organization, and supervision of the company's network of independent sales representatives;

d. Defendant CHUA would be responsible for the company's administrative operations, namely the design and sourcing of products, the coordination of orders and shipping, and the bookkeeping of the business;

e. Except with Defendant CHUA's consent, Plaintiff NOLAND and Defendant MORAND would not involve themselves with Defendant CHUA's administrative operations of the business, and except with Plaintiff NOLAND and Defendant MORAND's consent, Defendant CHUA would not involve himself with the field operations of the business;

f. Defendant CHUA would contribute his ZhenLife business project, which would become the Philippines wing of the partnership business;

g. Defendant MORAND and Plaintiff NOLAND would contribute their personal networks of sales representatives and network builders throughout North America and globally;

h. The revenues of the business would be allocated as follows:

   i. Total revenues would be divided equally into two portions.

   ii. One half of revenues would be set aside to pay the commissions owing to the business' network of distributors, according to a set formula. The precise details of the commission formula had not yet been determined, but it was agreed that the formula was to be consistent with the best practices of the network marketing industry in order to maximize the productivity of

Defendant OGEI's distribution network. In any event, a portion of the funds (the "COMMISSION PROFITS") set aside for commissions would accrue to the account of a "Master Distributor" (which was a pseudonym for the partnership), according to the formula. The PARTNERS agreed that monthly draws would be paid from the COMMISSION PROFITS to Defendant CHUA, Plaintiff NOLAND, and Defendant MORAND (as "consulting fees", in amounts to be agreed upon) and the remaining COMMISSION PROFITS would be divided according to the following proportions:

    1. 25% to Defendant CHUA;

    2. 25% to Paintiff NOLAND; and

    3. 25% to Defendant MORAND;

    4. 25% to investor(s), who had not yet been identified, or for management incentives;

iii. The other half of the business' revenues would be set aside to pay for all other costs of the business, including the purchase of ganoderma-based coffee, tea, other beverages; shipping; packaging; wages of employees; rent; and administrative costs. The profit remaining after the payment of these other expenses (the "ADMINISTRATIVE PROFITS") would be divided according to the following proportions:

    1. 51% to Defendant CHUA;

    2. 10% to Plaintiff NOLAND

    3. 10% to Defendant MORAND;

    4. 9% to individuals identified at this stage by Defendant CHUA only as "existing investors"; and

    5. 20% to be allocated as agreed by Plaintiff NOLAND, Defendant MORAND, and Defendant CHUA.

From the start of the OGEI Partnership in 2008, Defendant CHUA and Defendant MORAND had no intention to honor the terms of their partnership agreement with Plaintiff NOLAND, but instead intended to use his talents, as a world class sales coach, speaker, and distributor recruiter, to build OGEI's expansive distributor organization. OGEI's (which resulted totaling millions of distributors grossing hundreds of millions of dollars of product sales without ever conferring upon him the benefits of the Partnership. Within weeks of arriving at the AGREEMENT with Plaintiff NOLAND, Defendants CHUA and MORAND conspired with Defendants HOLTON BUGGS JR. ("Defendant BUGGS") and JAMIE FOO ("Defendant FOO"), to defraud Plaintiff NOLAND of his rightful partner's share of the ownership in the OGEI. Said Defendants repeatedly embezzled monies accruing to Plaintiff NOLAND under the AGREEMENT, including the following monetary agreements:

    a. Defendant CHUA secretly, arbitrarily, and corruptly instructed attorney Stuart Moir, OGEI's attorney (who had been Plaintiff NOLAND's attorney before he introduced him to Defendants CHUA and MORAND) to not go forward with the preparation of a formal written partnership agreement which Attorney Moir had been assigned to prepare by the PARTNERS and which he understood was to be based upon the oral agreement reached by the PARTNERS. Defendant CHUA also secretly, arbitrarily, and corruptly instructed Attorney Moir to issue 400 Class B non-voting shares in OGEI to Defendant CHUA.

    b. From the outset of the OGEI Partnership, Defendant CHUA misled Plaintiff NOLAND and encouraged him to publicly represent to OGEI's field of distributors

-7-

that OGEI's coffee products contained organic ganoderma sourced from a certain Chinese company, Xianzhilou, when Defendant CHUA knew this was not the case. This misrepresentation by CHUA was not only fraudulent, but also was a violation of the term of the AGREEMENT that OGEI conduct itself with integrity. This misrepresentation was also a violation of Defendant CHUA's duty of good faith as a partner, and consumer protection laws in most of the countries where OGEI carried out its business.

c. Unbeknownst to Plaintiff NOLAND, Defendant CHUA unlawfully diverted funds to Defendant CHUA's nominees and associates by placing them high up in the commission structure of the OGEI's compensation plan to ensure that they would be paid commissions to which they were not entitled.

d. From the commencement of the business, Plaintiff NOLAND repeatedly asked Defendant CHUA to provide him with access to the books of the partnership, so that he would be able to understand why he never received any payments from the profits of the business that were to be divided among the PARTNERS ("ADMINISTRATIVE PROFITS"). Plaintiff NOLAND also inquired as to why he did not receive profits from from the privately labelled Organo Gold Master Card ("CARD PROFITS"), which was one of the collateral products of OGEI as an adjunct to their flagship coffee product). Defendant CHUA, however, never gave Plaintiff NOLAND such information, never allowed Plaintiff NOLAND access to the books of the business, and never made any payments to Plaintiff NOLAND with respect to either the ADMINISTRATIVE PROFITS or CARD PROFITS.

e. Defendant CHUA failed and refused to issue shares to Plaintiff NOLAND in Defendants entities in the Philippines, Jamaica, and the United States (the largest sources, by far, of Defendants' sales revenue). Defendant CHUA withheld these

payments by using knowingly false misrepresentations and excuses to defraud Plaintiff NOLAND of his rightful share of the beneficial ownership of all OGEI subsidiaries, wherever situated.

f. Defendant CHUA advised Plaintiff NOLAND and Defendant MORAND that it was necessary to incorporate other companies in other jurisdictions, including the Phillipines, Jamaica, and the United States, and Plaintiff NOLAND and Defendant MORAND accepted this advice. Defendant CHUA's advice was not given in good faith and was for his own corrupt purposes, and Defendant CHUA instructed the incorporating attorneys to issue 100% of the shares in those companies to himself. Defendant CHUA assured Plaintiff NOLAND that he and Defendant MORAND would be issued their shares, but no such shares were ever issued.

g. In or around October 2008, Defendant MORAND and Plaintiff NOLAND asked Defendant CHUA to disclose to them all of the agreements he had entered into with Defendant CHUA's existing investors. Defendant CHUA purported to do so but in fact failed to disclose all his agreements with existing investors;

h. In or around July 2009, Morgan Tharpe, OGEI's Compliance Officer, was dealing with allegations that distributors were making claims about the medical efficacy of OGEI's products, and about the amount of income that could be made by becoming an OGEI distributor. Both these types of claims were strictly prohibited by OGEI's policies and were deceptive marketing practices. At the request of the Defendants BUGGS, whose "downline" distributors had been making medical and income claims, CHUA blocked Tharpe from access to OGEI's "back office" website without explanation and without notifying Plaintiff NOLAND. Before restoring Tharpe's access, Defendant CHUA demanded that Tharpe be less strict in enforcing OGEI's policies on its key distributors, contrary to the term of the AGREEMENT stipulating

that dishonest marketing practices would not be tolerated by OGEI.

i. In or around September 2009, when Tharpe continued to sanction distributors in Defendant BUGGS's "downline" for dishonest marketing practices (at the request of Defendant BUGGS) Defendant CHUA cut off Tharpe's access to OGEI's online "back office," and requested the creation of new procedures that would control Tharpe's ability to sanction distributors;

j. After it became clear that Plaintiff NOLAND had succeeded in building a massive MLM distribution network for OGEI, as described above, Defendants CHUA, MORAND, and FOO decided they no longer needed Plaintiff NOLAND, and, no later than September 2009, Defendants CHUA, MORAND, and FOO entered into a conspiracy with Defendant BUGGS to exclude Plaintiff NOLAND from his role in the management of the firm, and transferred Plaintiff NOLAND's responsibilities to Defendant BUGGS. Defendants BUGGS, CHUA, MORAND, and FOO all knew that Plaintiff NOLAND was entitled to continue in his role in the firm, and they agreed to coordinate the transfer of Plaintiff NOLAND's responsibilities and authority within the business to themselves without Plaintiff NOLAND's consent. Said Defendants did this to deprive Plaintiff NOLAND of the benefits of his share of his ownership as one of the PARTNERS of OGEI and to take those benefits for themselves.

k. Defendant CHUA issued shares to Defendant FOO in excess of the 9%, per the original agreement. Said shares also included voting rights, which directly undermined Defendant CHUA's promise that FOO would only be a passive investor with no decision making power.

l. In or around August 2009, Defendant CHUA began refusing to respond to Plaintiff NOLAND's communications sent in the ordinary course of the business of OGEI.

m. On or around September 30, 2009, Defendants CHUA and MORAND purported to introduce Defendant FOO as a partner, without Plaintiff NOLAND's consent, and proceeded to treat her as such.

n. On or about October 2, 2009, Defendants CHUA and MORAND insisted that Plaintiff NOLAND agree to various corporate resolutions relating to the governance of the OGEI, and then subsequently relied upon those resolutions to deny that decisions respecting OGEI were to be made unanimously between the three of them, as required by the AGREEMENT.

o. In or around October 2009, Defendants CHUA and MORAND created new accounts in the distributor compensation plan structure (similar to the "Master Distributor" account) and diverted revenues to these new accounts and away from the COMMISSION PROFITS. Plaintiff NOLAND and his nominee were entitled to a share equal to 32.5% of the COMMISSION PROFITS according to the AGREEMENT. Defendants CHUA and MORAND diverted such funds without the knowledge or consent of Plaintiff NOLAND, and did so for the benefit of themselves and for the benefit of Defendant BUGGS, Defendant FOO, and each of their nominees.

p. Without knowledge or consent of NOLAND, Defendant CHUA further diverted revenue of OGEI to himself and/or his nominees by the payment of unauthorized management fees.

q. On or about November 1, 2009, without the consent or knowledge of Plaintiff NOLAND, Defendant CHUA instructed the OGEI's technical staff to give Defendant CHUA exclusive control over the software system. This system determined the distribution of the commissions to OGEI's distributors and the retention of the COMMISSION PROFITS.

r. On or about November 4, 2009, Defendants CHUA and MORAND informed Plaintiff NOLAND that they had unilaterally hired an individual named Carla Segato and had, without Plaintiff NOLAND's consent, given Segato responsibility for OGEI events, including seminars and conferences, which had been managed by Plaintiff NOLAND.

s. In or around November 2009, Defendants CHUA and MORAND began paying consulting fees to Defendant FOO out of the "Master Distributor" accounts prior to the partitioning of the COMMISSION PROFITS without the knowledge or consent of Plaintiff NOLAND. These action secretly increased Defendant FOO's share of OGEI's profits beyond the maximum amount fixed by the AGREEMENT between Plaintiff NOLAND, Defendant MORAND, and Defendant CHUA;

t. On or about November 5, 2009 Plaintiff NOLAND submitted an invoice for $2,000 he had expended in the ordinary and proper conduct of OGEI's business, and his request for reimbursement was denied. He asked Defendants MORAND and CHUA to arrange for his reimbursement, but they failed and refused to do so;

u. On November 9, 2009, despite the fact that Plaintiff NOLAND was not a distributor of OGEI, Defendants CHUA and MORAND ordered Tharpe to censure NOLAND for alleged non-compliance with OGEI's policies regarding distributor conduct, and to threaten to suspend or terminate his relationship with OGEI (including payment of Plaintiff NOLAND's share of the COMMISSION PROFITS).

v. On or about November 9, 2009, Defendants CHUA and MORAND also blocked Plaintiff NOLAND's access to the firm's online "back-office," thereby depriving him of access to information necessary for the management of the distributor network. Plaintiff NOLAND repeatedly asked Defendants CHUA and MORAND for restored access to the firm's online "back-office," but those requests were denied.

-12-

    w. On or about November 9, 2009, Defendants CHUA and MORAND arranged for Plaintiff NOLAND to be blocked from the daily teleconferences with OGEI's distributor network, preventing him from executing his primary role in the management of the business, namely the recruitment, training and management of the distributor network;

    x. Defendants CHUA, MORAND, and FOO caused the cessation of all payments to Plaintiff NOLAND from the revenues and profits of OGEI, effective November 1, 2009. Those profits included the following categories of profits:

        i. Commission Profits;

        ii. Card profits;

        iii. Summit Profits (seminars, tools, trainings);

        iv. Administrative Profits (profits that did not fall into any of the other three above referenced profit centers); and

        v. Consulting fees, in the amount of $24,000.00 per month to Plaintiff NOLAND.

    y. On November 13, 2009, Defendant CHUA wrote to Plaintiff NOLAND and Defendant MORAND, asserting the exclusive right to make all decisions on behalf of OGEI, whether or not Plaintiff NOLAND and Defendant MORAND were in agreement.

    z. On or about November 13, 2009, Defendants CHUA and MORAND appointed Defendant BUGGS to "VP of Sales" and transferred the balance of Plaintiff NOLAND's responsibilities in the operation of OGEI to Defendant BUGGS, and denied that the OGEI partnership existed.

12. Plaintiff NOLAND was prevented by Defendants OGEI, CHUA, MORAND, FOO and BUGGS from having any role whatsoever in the management of the OGEI since about

November 4, 2009.

13. Since Plaintiff NOLAND's purported expulsion from the partnership, Defendants CHUA, MORAND, and FOO have continued to use the assets they and Plaintiff NOLAND pooled to create OGEI, including, but not limited to, the following:

  a. The firm's business name;

  b. The firm's packaging and marketing materials;

  c. The firm's goodwill; and

  d. The network of distributors recruited by Plaintiff NOLAND, which still generates in excess of 95% of the total global sales of OGEI.

The vast majority of the network of distributors recruited by Plaintiff NOLAND were situated in, and continue to be situated in and operate their distributorships in the United States; specifically, this includes thousands of ORGANO GOLD distributors in Nevada.

14. Defendants CHUA, MORAND, and FOO have failed to account to Plaintiff NOLAND for his share of the partnership's assets, or for the profits generated by their continued use of those assets despite Plaintiff NOLAND's demands that they do so. The cumulative effect of Defendants CHUA and MORAND's breaches of the terms of the Partnership Agreement, was to unlawfully expel Plaintiff NOLAND from the partnership, which was therefore dissolved by their wrongful conduct. In the alternative, Defendants CHUA and MORAND repudiated the AGREEMENT by their conduct, and Plaintiff NOLAND has accepted that repudiation.

15. On November 27, 2009, Defendants CHUA, BUGGS, MORAND, and FOO issued an announcement, on the daily teleconference with OGEI's distributors, that Plaintiff NOLAND was no longer involved with OGEI.

16. Defendants CHUA, BUGGS, MORAND, and FOO instructed the law firm of Nehra & Waak to send a letter to Plaintiff NOLAND dated December 2, 2009, which purported to terminate Plaintiff NOLAND's entitlement to a share of the COMMISSION PROFITS, on the basis

that Plaintiff NOLAND was only one of OGEI's distributors and not a partner. The letter asserted that Plaintiff NOLAND's only legal relationship to OGEI was as a former distributor, and that he would be bound by his independent representative agreement with OGEI. But Plaintiff NOLAND. never entered into any such agreement.

17. No settlement of the accounts of the partnership have been made, and Plaintiff NOLAND is entitled to the following:

   a. part-ownership of the OGEI business and assets;

   b. consulting fees;

   c. 32.5% of the COMMISSION PROFITS;

   d. 32.5% of the CARD PROFITS;

   e. 16.67% of the ADMINISTRATIVE PROFITS; and

   f. an equal share of the Summit Profits.

18. The OGEI's ADMINISTRATIVE PROFITS are attributable primarily to the firm's name and goodwill, and the vast majority of OGEI's COMMISSION PROFITS are attributable to the network of distributors recruited by Plaintiff NOLAND.

## FIRST CLAIM FOR RELIEF

**Violations of Federal RICO Statutes (Racketeering Influenced Corrupt Organization)**

19. Plaintiff NOLAND hereby reincorporate by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

20. Defendants violated the four elements laid out in the RICO statute, 18 U.S.C. § 1962(c), by participating in the conduct of an enterprise through a pattern of racketeering activity.

21. Plaintiff NOLAND has standing since he has been injured in his business or property proximately caused by the conduct constituting the violation.

22. Proximate cause exists with respect to Plaintiff NOLAND's RICO claim against the Defendants due to the direct relation between the injury asserted and the injurious conduct alleged

herein.

23. The United States RICO law protects the public, and in this case, Plaintiff NOLAND, from those who would unlawfully use an enterprise (whether legitimate or illegitimate) as a vehicle through which unlawful activity is committed pursuant to 18 U.S.C. § 1961(4). Defendant ORGANO GOLD INTERNATIONAL, INC., is a Nevada corporation, based in Henderson, Nevada. A company by the same name, also named as a Defendant in this matter, is a Washington corporation, based in Ferndale, Washington. Defendant ORGANO GOLD ENTERPRISES, INC. is a company based in Victoria, British Colombia, Canada, and is a Canadian corporation. Collectively, all three corporations have been referred to herein as "Defendant OGEI" or "OGEI." OGEI qualifies as an enterprise under 18 U.S.C. § 1961(4).

24. Defendants operated through the OGEI and/or as a group of persons associated together for a common purpose of engaging in a course of conduct, which under the law can also be considered an enterprise.

25. OGEI is an ongoing organization being used by Defendants as a vehicle for the commission of two or more predicate crimes.

26. Defendants are enabled to commit the predicate offenses by virtue of their position in the enterprise or involvement in or control over the affairs of the enterprise and the predicate offenses are related to the activities of that enterprise.

27. Subsection (5) of 18 U.S.C. § 1961 ("Section 1961") defines pattern of racketeering activity to require at least two acts of racketeering activity. There is a well-established relationship between the predicate acts, which are the repeated commission of predicate criminal acts of "wire fraud" by the Defendants in violation of 18 U.S.C. § 1343, including the following: fraud by wire, radio, or television, as the Defendants "devised or intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication

-16-

in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

28. Defendants have repeatedly and continuously performed acts of wire fraud by marshalling a series of falsehoods for distribution by members of the OGEI using a variety of communication tools and means. Defendants' primary object was to justify criminal conversions of the residual income owing. Said distinct criminal acts have been repeated on a monthly basis since April 2008 and will continue for the foreseeable future on a monthly basis, for not less than ten years. Said criminal acts have and continue to victimize, damage, and otherwise harm Plaintiff NOLAND, and have resulted in tens of millions of dollars accruing to the OGEI and individual Defendants, by means Plaintiff NOLAND's efforts to increase sales and profits among OGEI's distributor network. Such sale increases were the direct result of Plaintiff NOLAND's his coaching, speaking, and trainings.

29. These acts constitute a violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) (2012), which provides that unfair or deceptive acts or practices in or affecting commerce by the enterprise in "violation" of agreements between the parties as alleged herein, are declared unlawful. The actions by the Defendants complained of herein, repeated acts of wire fraud, constitute prohibited racketeering which proximately caused Plaintiff NOLAND's severe and ongoing injuries to his business or property. The factor of continuity plus relationship combines to produce the pattern of such conduct in this case. Said injuries have damaged Plaintiff NOLAND in an amount of not less than $100,000.00 per month for the past ten years and will continue to do so for many years to come at the hands of the Defendant OGEI and its personnel and entities named herein.

## SECOND CLAIM FOR RELIEF

**Conspiracy to commit violations of RICO Statutes (Racketeering Influenced Corrupt Organization):**

30. Plaintiff NOLAND hereby reincorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

31. Defendants' conduct alleged herein constitutes a conspiracy to commit violations of the RICO statutes under 18 U.S.C. § 1962(d), as said Defendants conspired to violate §1962(c) by knowingly agreeing to facilitate a scheme which includes the operation or management of a RICO enterprise through a pattern of racketeering activity which is the repeated commission of predicate criminal acts of "wire fraud" by the Defendants. These acts are in violation of 18 U.S.C. § 1343, which includes fraud by wire, radio, or television, as the Defendants "devised or intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

32. The repeated and continuous acts of wire fraud by Defendants conduct constitute "deceptive practices" in violation of, *inter alia*, Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1) (2012), which provides that unfair or deceptive acts or practices in or affecting commerce are declared unlawful.

33. The Defendants violated Section 1962(c) by participating in the (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.

## THIRD CLAIM FOR RELIEF

**Nevada RICO Violations
(NRS 207.350 to 207.520)**

34. Plaintiff NOLAND hereby reincorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

-18-

35.     OGEI and other the named Defendants herein have participated in several criminal thefts by conversions of commissions and profits, to which Plaintiff NOLAND rightfully claims ownership, and which are directly related to racketeering. Such conversions and criminal thefts have the same or similar pattern, intents, results, accomplices, victims or methods of commissions, or are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

36.     Plaintiff NOLAND's injuries flow from Defendants' violation of a predicate Nevada RICO act under NRS 207.350 to NRS 207.520; and Defendants' violations of the predicate acts directly and proximately caused Plaintiff NOLAND's injuries; and the Plaintiff NOLAND did not participate in committing the criminal acts.

## CONCLUSION AND PRAYER FOR RELIEF

As a result of Defendants' actions, Plaintiff NOLAND is entitled to recover from Defendants all past and future costs, damages and losses incurred, in an amount to be proven at trial or at the time judgment is requested.

1. Plaintiff NOLAND is further entitled to recover from Defendants:

   a. Judgment against Defendants in an amount not less than $25 million for past and future costs, losses and damages sustained by him as a result of Defendants' illegal actions, as well as all other wrongdoing complained of herein;

   b. Treble damages for their RICO violations in an amount not less than $75 million;

   c. Disgorgement of all monies by which Defendants have become unjustly enriched;

   d. Attorneys' fees and Court costs incurred in prosecuting this action pursuant to law, in an amount to be proven at the time judgment is requested;

-19-

e. An award of Plaintiff NOLAND's cost of suit incurred therein;

f. Oher and further relief as the court deems just and equitable under the circumstances.

2. The Plaintiff NOLAND demands a trial by jury.

DATED this 12 day of July, 2018.

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT

By /s/ Mark Albright
G. MARK ALBRIGHT, ESQ.
Nevada Bar No. 1394
Quail Park I, Suite D-4
801 South Rancho Drive
Las Vegas, Nevada 89106
Email: gma@albrightstoddard.com

David Eisenstein, Esq.
Law Office of David G. Eisenstein
California Bar No. 224646
(*pro hac vice pending*)
Will comply with LR 1A 11-2 within 10 days
Post Office Box 1202
Carlsbad, California 92018
Email: Eisenlegal@gmail.com

Attorneys for the Plaintiff NOLAND